# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Puckmaster, Inc., a Minnesota corporation,

　　　　　　　Plaintiff,

　　v.

Metalbrik Equipment, LLC, a Minnesota
limited liability company; SOS Metals, Inc.,
a California corporation; Transworld Alloys,
Inc., a California corporation; and Christopher
Duncan, individually,

　　　　　　　Defendants.

**AMENDED MEMORANDUM
OPINION AND ORDER**
Civ. No. 04-2599 ADM/JSM

---

Scott A. Johnson, Esq. and Todd M. Johnson, Esq., Johnson Law Group LLP, Minnetonka, MN,
argued on behalf of Plaintiff.

Kristin R. Eads, Esq., Faegre & Benson LLP, Minneapolis, MN, argued on behalf of Defendants
SOS Metals, Inc. and Transworld Alloys, Inc.

---

## I. INTRODUCTION

On August 23, 2006, oral argument before the undersigned United States District Judge

was heard on Defendants SOS Metals, Inc. ("SOS") and Transworld Alloys, Inc.'s ("TWA")

Motion for Summary Judgment [Docket No. 160] and Motion for Summary Judgment on

Plaintiff's Claims for Damages [Docket No. 180].  In its Amended Complaint [Docket No. 142],

Plaintiff Puckmaster, Inc. ("Plaintiff") asserts claims for violation of the Lanham Act, 15 U.S.C.

§ 1125; tortious interference with contract; tortious interference with prospective contracts; civil

conspiracy; conversion; and joint venture, joint adventure, and aiding and abetting.  For the

reasons stated herein, SOS/TWA's Motions are granted in part and denied in part.

## II. BACKGROUND

A.    **The Parties**

1.    **MCP and MCT**

A "Puckmaster" is a machine that presses metal shavings together into the shape and size of hockey pucks, which are then sold as valuable scrap metal.  Nelson Dep. (Defs.' Ex. [Docket No. 178] 1; Johnson Aff. [Docket No. 198] Ex. A) at 16.  Puckmaster machines were previously manufactured by Metal Chip Pelletizer ("MCP"), a company in Montgomery, Minnesota.  Id. at 11, 16, 26.  In 1996, Chris Duncan ("Duncan") and John Nelson ("Nelson") loaned MCP $50,000 and $300,000, respectively.  Id. at 17, 19.  In October 1999, Metal Chip Technologies ("MCT") Holdings, LLC bought MCP.  Id. at 26.  MCT Holdings was owned 25% by Duncan and 75% by Nelson.  Id. at 25-27.  MCT Holdings also owned 52% of another company, MCT Manufacturing, Inc.  Id.  The remaining 48% of MCT Manufacturing was owned evenly by Mike Rodman ("Rodman") and Marvin Squire ("Squire").[1]  Id. at 21, 25.  A third MCT company, MCT Sales, LLC, was owned 100% by Nelson.  Id. at 25.[2]

MCT Holdings, with Duncan in charge, was largely responsible for operations.  Id. at 27. MCT Sales was run by Dennis Sultany ("Sultany"), and MCT Manufacturing was run by Rodman.  Id.  Nelson did not play much of a role with the MCT companies, and was "just . . . like a shareholder . . . I was just there to get my money back."  Id. at 27.  At his deposition, Nelson testified that he was always interested in selling the MCT companies.  Id. at 34.  In 2003, Duncan discussed some offers to buy MCT with Nelson, but none of the offers became sales

---

[1] In 2001, Rodman and Squire left the MCT companies.  Nelson Dep. at 29.

[2] The relationship of the three MCT entities to one another is complicated, although they apparently functioned together to manufacture and sell Puckmaster machines.  Nelson Dep. at 25.  The MCT entities will be referred to collectively as "the MCT companies" or "MCT."

2

"[b]ecause they were just too low." Id. at 36.

## 2.      Blaine and Puckmaster

On March 29, 2004, the MCT companies assigned, sold, conveyed, and transferred to

Puckmaster, Inc., "all intellectual property, trademarks and patents, as well as all claims for

enforcement of their trademarks or patents, including infringement and dilution claims under the

federal Lanham Act." Id. at 153; Defs.' Ex. 4.  Nelson signed the Assignment.  Defs.' Ex. 4.

On April 22, 2004, the MCT companies, Nelson, and Blaine Manufacturing, Inc.

("Blaine") entered into an Asset Purchase Agreement.  Johnson Aff. Ex. E.  The agreement states

"the Parties have entered into a License Agreement dated February 20, 2004 and effective

February 4, 2004, to operate the business during the period of litigation." Id. at 1.  The

agreement purports to sell MCT's assets to Blaine, including the equipment, furniture, fixtures,

inventory, and supplies; granting all rights to all intellectual property; assigning all claims,

causes of action, and lawsuits; and MCT's goodwill and customer lists.  Id. at 1-2.  The

agreement is signed by James Cooper ("Cooper") and Nelson.  Id. at 9.

At his deposition, Nelson testified both that the MCT companies have been sold to

Blaine, and that the sale has not yet been consummated, and that he "would be surprised if it ever

is."  Nelson Dep. at 64, 212.  At his deposition, Cooper testified that he is the Chief Executive

Officer ("CEO"), Chief Financial Officer ("CFO"), and President of Puckmaster, Inc., as well as

the secretary of Blaine.  Cooper Dep. (Defs.' Ex. 3) at 8, 12.  Cooper also testified that the MCT

intellectual property is held by Puckmaster, Inc., and the manufacturing assets are controlled but

not owned by Blaine.  Id. at 13.  He testified that as of March 29, 2005, the assets were still

owned by MCT and that no closing has yet occurred due to concern about the assets being

3

stolen.  Id. at 13, 53-54, 70-71, 73-74.

In his August 28, 2006 affidavit, Cooper asserts that Blaine has acquired the assets of the MCT companies, and the intellectual property and trademark rights have been assigned to Puckmaster, Inc.  Cooper Aff. [Docket No. 209] ¶ 2.  Cooper further asserts that Blaine ratifies the actions of Puckmaster, Inc. in this case and "agrees to be bound in all regards by any final order or judgment to the extent that it affects Puckmaster, Inc., in the same manner that Puckmaster, Inc. would be so bound."  Id. ¶¶ 3-4.

### 3.    MetalBrik

In the summer to fall of 2003, Duncan formed a new company called MetalBrik Equipment, LLC ("MetalBrik") while he was still an owner of MCT Holdings.  Duncan Dep. (Defs.' Ex. 10) at 15; Duncan Trial Test.[3] (Johnson Aff. Ex. D) at 132-33.  Duncan was the sole owner, officer, and director of MetalBrik.  Duncan Dep. at 15.  Duncan did not sell or give any stock in MetalBrik to Nelson.  Duncan Trial Test. at 132-33.  Duncan, operating as MetalBrik, offered Puckmaster machines for sale.  Id. at 133.  In early September 2003, Duncan (1) transferred MCT's assets to MetalBrik, (2) hired away MCT employees, (3) apprised MCT customers that "MetalBrik" would be replacing MCT, (4) diverted MCT's accounts receivables to MetalBrik, and (5) started filling existing Puckmaster parts orders through MetalBrik.  Weiers Dep. (Johnson Aff. Ex. V) at 49-50; Abraham Trial Test. (Johnson Aff. Ex. P) at 28, 36-37, 40-41; Weiers Trial Test. (Johnson Aff. Ex. T) at 71; Wildes Trial Test. (Johnson Aff. Ex. S) at 116-28; Johnson Aff. Exs. Q, R, U.

---

[3] Prior to this lawsuit, MCT sued MetalBrik and Duncan in Minnesota state court for conversion and related claims.  "Trial" references and references to state court litigation are to this proceeding.

4.     **SOS and TWA**

SOS and TWA are each equally co-owned by brothers Donald Shadrow ("Donald") and

Sandford Shadrow ("Sandford").  D. Shadrow Dep. (Johnson Aff. Ex. C; Defs.' Ex. 6) at 11;

Bell Dep. (Johnson Aff. Ex. B; Defs.' Ex. 5) at 17, 21.  Todd Bell ("Bell") is the CFO of SOS.

Bell Dep. at 15.  SOS is a scrap metal processor and TWA sells finished, non-scrap metal

product.  Id. at 17, 19-21.  Both companies are located in California.  Id. at 17, 24.

**B.     The Plan**

Plaintiff alleges that Defendants formed a joint venture to sell Puckmaster machines and

procure long-term scrap metal agreements.  Specifically, the alleged joint venture required that

SOS/TWA buy a Puckmaster machine from Duncan/MetalBrik to be placed at a particular

customer's company, in exchange for a long-term scrap agreement between SOS/TWA and the

customer.  See Duncan Trial Test. at 55-56; D. Shadrow Dep. at 29-31.  SOS/TWA would pay

the customer a certain pre-arranged amount for the pucks, and would then re-sell the pucks

created by the customer's pucking machine, generating a profit.  See Bell Dep. at 73.  One

variation on this plan, where the customer buys the Puckmaster machine directly and then sells

the pucks to SOS/TWA, was a possible option.  Duncan avers that the above-described plan is

"something that I'd been working on for quite sometime," but Bell avers Donald had conceived

and executed this production/sale scheme before anyone from SOS met Duncan.  Duncan Trial

Test. at 55-57; Bell Dep. at 72-73.

**C.     SOS/TWA and Duncan**

Donald Shadrow first met Duncan in early 2003.  D. Shadrow Dep. at 17, 19.  Although

he had no prior connection to Donald, Duncan called Donald after learning that SOS purchased a

pucking machine for a customer from another manufacturer in exchange for a long-term scrap

agreement between SOS and the customer.  D. Shadrow Dep. at 18-19; Duncan Dep. at 11-12.

Duncan later traveled to Los Angeles and visited SOS.  D. Shadrow Dep. at 19; Duncan Dep. at

12.  At that time, Duncan told Donald that he was interested in selling pucking equipment to

SOS, since SOS was willing to purchase pucking machines for customers in exchange for long-

term scrap agreements with those customers.  D. Shadrow Dep. at 20; Duncan Dep. at 13.

Duncan then began calling SOS frequently and "was looking to obviously establish a business

relationship."  D. Shadrow Dep. at 20.  SOS and Duncan did make sales calls together at various

companies.

### 1.     Riverside Manufacturing

In 2003, Duncan introduced SOS to Riverside Manufacturing in Minnesota.  Bell Dep. at

31-32.  Because Riverside did not have funds to purchase a pucking machine, SOS offered to

purchase the machine from Duncan and place it at Riverside in exchange for a long-term scrap

agreement between SOS and Riverside.  Bell Dep. at 32; Weishaar Dep. (Defs.' Ex. 13) at 21.

SOS ultimately purchased, with Duncan as sales representative, an MCT Pucklite Model LT250

machine from MCT in July of 2003, and placed it at Riverside.  Defs.' Ex. 15.  In exchange,

Riverside and SOS entered into a long-term scrap agreement.  Bell Dep. at 72, 129; Weishaar

Dep. at 33, 69-70; Mayer Dep. (Defs.' Ex. 14) at 40-41.  The money from the sale of the

Puckmaster machine to Riverside went to MCT, not MetalBrik.  Duncan Dep. at 116.  The scrap

agreement was between SOS and Riverside, and Duncan/MCT/MetalBrik did not receive any

profits from the scrap agreement.  Weishaar Dep. at 69-70; Duncan Dep. at 110.  At his

deposition, Donald Weishaar of Riverside denied any mention of the relationship between SOS

6

and MCT as a "partnership" or "joint venture."  Weishaar Dep. at 24, 67-69.  By May 2004,

Riverside owned the Puckmaster machine outright based on scrap metal provided to SOS.  Id. at

70.

###     2.     Turbocam

In July 2003, Andy Ballow ("Ballow") of SOS and Duncan met with Bill Doyle

("Doyle") of Turbocam, Inc. ("Turbocam") in New Hampshire to propose an agreement whereby

SOS would finance the manufacture of a Puckmaster machine to be placed at Turbocam in

exchange for a long-term scrap metal agreement between Turbocam and SOS.  Doyle Dep. I

(Johnson Aff. Ex. I; Defs.' Ex. 17) at 41-43, 46.  SOS would purchase and haul the finished

pucks from Turbocam, and retain any profit made after re-selling the pucks.  Id. at 46-47, 66-67,

113.  The sales presentation to Turbocam included a seventeen page recommendation touting the

Puckmaster machine.  Id. at 41-43; Johnson Aff. Ex. H.  The first page of the recommendation

states that it is presented by "Chris Duncan, Vice President, MetalBrik-Puckmaster."  Johnson

Aff. Ex. H.  There is no mention of SOS in the recommendation, except for one page supplied by

SOS regarding aluminum material pricing.  Id.; Doyle Dep. I at 43.

Turbocam ultimately purchased a Puckmaster machine directly from Duncan, and entered

into a scrap agreement with MetalBrik, not SOS.  Doyle Dep. I at 68, 108-09; Doyle Dep. II

(Defs.' Ex. 18; Johnson Aff. Ex. XX) at 26-29.  SOS never received any proceeds from

Turbocam's purchase of a Puckmaster machine from MetalBrik.  Duncan Dep. at 110-11.  At his

deposition, Doyle testified that he understood Ballow was affiliated with SOS, not Puckmaster or

MetalBrik.  Doyle Dep. I at 105.  Doyle also learned from Duncan that Duncan had previously

had the same financing arrangement with other companies.  Id. at 67.  The single conversation

between Doyle and anyone from SOS was the occasion of Ballow visiting Turbocam in July

2003.  Id. at 109-10.

**3.    GE Company Industrial Systems**

In April 2003, Duncan sent a letter bearing the logos of Puckmaster, MetalBrik, and SOS

to Paul Curran ("Curran") of GE Company Industrial Systems ("GE") in Maine.  Johnson Aff.

Ex. M.  In the letter, Duncan discusses the "MetalBrik-Puckmaster system" for the metal chip

handling process and SOS's ability to assist with the pucked product.  Id.  Specifically, the letter

states:

> We have also included a unique option for your consideration.  SOS Metals, Inc. and
> MetalBrik-Puckmaster have worked together for the past several years to develop an
> environmentally sound program for metal chip processing and scrap metal handling.
> SOS can provide all services associated with handling and pickup of the pucked material
> along with any other scrap metals produced at the Auburn plant.

Id.

In the fall of 2003, SOS and Duncan met with Curran to propose SOS purchasing a

Puckmaster machine from MetalBrik and placing it at GE in exchange for a long-term scrap

agreement between SOS and GE.  Curran Dep. (Johnson Aff. Ex. K; Defs.' Ex. 16) at 29-32, 47-

48.  The proposal included a twenty-five page recommendation entitled "Increasing Coolant

Recovery and Reducing Labor on Metal Chip Processing: A Recommendation for GE."  Johnson

Aff. Ex. L; Curran Dep. at 29-32.  The form of the recommendation is similar to that provided to

Turbocam, except that SOS's logo is included on the first page of the GE recommendation.

Johnson Aff. Ex. L.  Also, the GE recommendation includes a section entitled: "The SOS Metals

Option: A Team Approach Designed to Revolutionize GE's Scrap Process."  Id. at SOS00097.

The report describes the proposed agreement between GE, SOS, and MetalBrik-Puckmaster, and

8

describes the relationship between MetalBrik and SOS as a "team," and a "working partnership." Id. at SOS00097-99.

At his deposition, Curran testified that "SOS and Puckmaster were going to work together at giving us a process of handling our chips." Curran Dep. at 31. The proposed agreement included SOS providing employees to operate the Puckmaster machine at GE over two shifts. Id. at 31-32. Ultimately, SOS did not place a Puckmaster machine at GE and did not enter into a scrap agreement with GE. Id. at 51-52. Nor did GE purchase a Puckmaster machine directly from Duncan or MetalBrik. Id. at 52.

### 4.     BP Castrol

In the summer of 2003, Duncan, Donald, and Bell were discussing Puckmaster machines and scrap agreements with BP Castrol in England. Johnson Aff. Ex. G. Duncan and Donald later traveled to England to meet with BP Castrol about the possibility of SOS buying a pucking machine from MetalBrik to be placed with BP Castrol in exchange for a long-term scrap agreement between BP Castrol and SOS. Bell Dep. at 80-81; D. Shadrow Dep. at 31-32, 52-55. BP Castrol was provided with a five page document entitled "Proposed Partnership for Metal Scrap Processing, Handling and Servicing of Industrial Accounts in Europe. A new venture between Castrol, MetalBrik, Puckmaster, SOS." Johnson Aff. Ex. O. The document states the goal of forming "a strategic partnership between Castrol Industrial Europe, SOS Metals, Inc. and MetalBrik/Puckmaster USA for the purpose of securing industrial accounts for swarf and scrap metal processing and handling in Europe." Id. The document lists the partners as Castrol Industrial Europe, SOS Metal, Inc., and MetalBrik/Puckmaster LLC. Id. BP Castrol ultimately rejected the arrangement. Bell Dep. at 83-84.

9

Donald avers that after he discovered that Duncan had been "lying to me about his involvement with Puckmaster," Donald contacted BP Castrol to inform them about the litigation and liability involving Duncan and Puckmaster.  D. Shadrow Dep. at 107-10.

**5.     Thorud**

At some point, Duncan spoke with Ronald Thorud about selling a Puckmaster machine from MetalBrik to Thorud, and informed Thorud he could pay for it by providing Duncan with the pucks.  Thorud Dep. (Johnson Aff. Ex. GG) at 9.  Thorud has testified his understanding was that SOS would be purchasing the pucks.  Id. at 10.  Bell testified that SOS never purchased a machine for Thorud.  Bell Dep. at 41.

**6.     Vought Aircraft Industries, Inc.**

In early 2004, Sandford called John Daugherty at Vought Aircraft Industries, Inc. ("Vought") in Texas to see if Vought would be interested in SOS purchasing from Duncan a Puckmaster machine, to be placed at a Vought facility in Tennessee, in exchange for a long-term scrap agreement between Vought and SOS.  S. Shadrow Aff. (Defs.' Ex. 7) at 1; Daugherty Aff. (Defs.' Ex. 8) at 1; Daugherty Dep. (Johnson Aff. Ex. HH; Defs.' Ex. 9) at 9-12.  In that conversation, Sandford represented to Daugherty that he and Duncan had visited the Tennessee facility.  Daugherty Dep. at 11.  Sandford avers that while he is also a co-owner of TWA, he made the call on behalf of SOS.  S. Shadrow Aff. at 1.  Sandford further avers that Daugherty declined the proposal and SOS never placed any Puckmaster equipment at Vought.  Id. at 2; Daugherty Aff. at 2.

In his initial affidavit, Daugherty averred that in a phone call from Sandford of TWA, Sandford "represented to me that his company, together with SOS Metals, Inc., another scrap

dealer, and Chris Duncan, were affiliated with Puckmaster and could supply Puckmaster machines to my company as part of a revenue-sharing arrangement." Daugherty Aff. Ex. A at ¶ 4. In his second affidavit, Daugherty averred that his call with Sandford concerned SOS Metals (with no mention of TWA), and that "[a]t no time did Mr. Shadrow represent to me that he or his company, SOS Metals, Inc., were authorized dealers or sales representatives for Puckmaster machinery, nor did I receive that impression from Mr. Shadrow's proposed arrangement." Daugherty Aff. ¶ 5. At his deposition, Daugherty testified that he thought Donald worked for SOS and Sandford worked for TWA, and he was confused and unclear "on all the interrelations between Transworld and SOS." Daugherty Dep. at 19.

Daugherty further testified that after speaking with Duncan in a second, separate phone call, he called Sultany of MCT, with whom he had a long standing working relationship, and learned that Duncan was not an authorized representative of Puckmaster. Id. at 12-14. Daugherty then emailed Sandford and related while he remained interested in pursuing revenue sharing opportunities with Sandford, SOS would have to make arrangements through Sultany if SOS wanted to provide a Puckmaster machine to Vought. Id. at 14-15; Johnson Aff. Ex. JJ. Daugherty also related that it was his understanding that MCT was "going through an ownership change and that Mr. Duncan is no longer affiliated with them." Johnson Aff. Ex. JJ.

**D.     Sale of MCT and MetalBrik**

In the spring of 2003, Duncan was looking for someone to buy the MCT companies. Bell Dep. at 28. Duncan solicited SOS to buy the MCT companies. On April 17, 2003, Duncan sent Bell an email and attached a five page Proposed Asset Purchase agreement between MCT Holdings and SOS. Johnson Aff. Ex. F. The purpose of the agreement is: "To form a joint

11

venture between MCT Puckmaster ("MCT") and SOS Metals ("SOS") for the sales and marketing of MCT metal chip processing equipment along with SOS scrap services.  Joint venture will form a new company and purchase assets of MCT Holdings LLC."  Id.  The ownership structure is described as "50% Shadrow + Shadrow" and "50% Duncan."  Id.  Duncan testified at his deposition that the proposal was prepared by Nelson.  Duncan Dep. at 14.  Bell testified that the asset purchase agreement was Duncan's proposal, and that SOS was not interested in buying the MCT companies.  Bell Dep. at 28-30, 71, 82; D. Shadrow Dep. at 27-28; Duncan Dep. at 13-14.  SOS never made any offer to Duncan to purchase the MCT companies. Duncan Dep. at 108-09; Bell Dep. at 28-30.

Duncan also sought assistance from SOS in launching MetalBrik.  In September 2003, Duncan, Bell, and Donald exchanged emails discussing the "new company" and "what investment we need."  Johnson Aff. Exs. W, X, Y.  Attached to one of the emails from Duncan was a proposal regarding payroll, revenue and expenses, and capital acquisitions of the "new company."  Johnson Aff. Ex. X.  At his deposition, Bell testified that the attachment from Duncan was a "fantasyland proposal."  Bell Dep. at 95.  On September 5, Duncan emailed Bell and Donald stating:

> I need to get a letter of intent by noon today showing your interest in funding the company. . . . If I cannot get a commitment or you do not think this is going to work, let me know right away.  I have to meet the employees this afternoon.

The proposed structure:

| | |
|---|---|
| amount: | $200,000 investment |
| type: | equity |
| structure: | 40%   duncan |
| | 40%   shadrow+shadrow. |

Johnson Aff. Ex. Y.

SOS was not interested in funding MetalBrik.  Bell Dep. at 35, 96-97, 99.  Bell claims

that SOS refused to provide a letter of intent, and let Duncan know that "we're not going to do

this."  Id. at 97.  Donald did not remember ever seeing the September 5 email, but said "it would

have been something that we wouldn't have been interested in; we just don't get involved with

partners."  D. Shadrow Dep. at 86.  SOS never made any offer to Duncan to purchase MetalBrik.

Duncan Dep. at 109.  Duncan also avers that SOS and TWA never entered into a joint venture

agreement, either written or oral, with MetalBrik.  Id. at 109.[4]

**E.      The Chinese Pucking Machine**

In September 2003, SOS purchased a Chinese pucking machine from Duncan.  Bell Dep.

at 35; Johnson Aff. Ex. CC; Defs.' Ex. 19.  SOS advanced Duncan $50,000.  Bell Dep. at 35; D.

Shadrow Dep. at 79.  SOS and Duncan characterize the $50,000 as a first payment toward the

Chinese pucking machine while Puckmaster argues that the $50,000 was an investment by SOS

in MetalBrik.  Bell Dep. at 35; D. Shadrow Dep. at 79-80; Duncan Dep. at 117; Cooper Dep. at

48.  SOS claims it made a payment for the Chinese machine in advance, at Duncan's request, so

that MetalBrik could fix and develop the Chinese machine to work properly.  Bell Dep. at 36-37,

116.  Bell avers that he had Duncan sign a promissory note for the $50,000 because SOS sent the

money to Duncan in his individual capacity rather than to MetalBrik.  Id. at 37-38, 41.  Bell

further avers that progress payments on machinery—where partial payment is made up front, and

other payments are made during process and delivery—is "pretty common in the industry."  Id.

_____

[4] Plaintiff has supplied a document entitled "Member Control Agreement of MetalBrik Equipment, LLC," created by Duncan's attorneys, but the agreement is blank as to any members other than MetalBrik, and Bell avers that he never saw this document until this lawsuit.  Defs.' Ex. 24; Bell Dep. at 49-51, 109; Corey-Edstrom Dep. (Defs.' Ex. 21) at 9, 17.

at 40.  SOS later made two more payments of $47,034 each to MetalBrik for the Chinese

pucking machine.  Bell Dep. at 40-41, 102-03, 106; Duncan Dep. at 117: Johnson Aff. Exs. AA,

BB, EE, FF.  The Chinese pucking machine was delivered to SOS in the spring of 2004.  Bell

Dep. at 36.

**F.      End of SOS/TWA/Duncan Relationship**

SOS claims it first learned in mid-January 2004 that "there may be some questions as to

Mr. Duncan's ability to sell Puckmaster equipment or use the Puckmaster name in connection

with his business."  Bell Aff. (Defs.' Ex. 2) ¶ 3.  In January, Bell, Donald, Duncan, and Duncan's

attorneys attended a dinner.  State court litigation involving Duncan and MetalBrik, the Chinese

pucking machine, and possible investment by SOS in MetalBrik was discussed at the dinner.

Corey-Edstrom Dep. at 11-12, 15, 26; Bell Dep. at 47-51.  Duncan's attorney recalls Duncan

wanted SOS to invest in MetalBrik.  Corey-Edstrom Dep. at 12, 18.  A few days after the dinner,

Bell spoke with Duncan's attorney and asked him to send SOS copies of the pleadings in the

state court litigation.  Id. at 16, 19-20; Bell Dep. at 51-52.  At his deposition, Bell testified that

"Chris Duncan had indicated to us that he had the ability to sell Puckmaster equipment and that

it was not a problem with MetalBrik in this whole deal.  Those [state court] Orders certainly

don't indicate that to me."  Bell Dep. at 63.  Bell states that "SOS Metals did not participate in

any sales calls with Mr. Duncan after finding out about the state court litigation."  Bell Aff. ¶ 3.

Bell further avers that SOS severed its relationship with Duncan after receiving copies of the

state court pleadings, except for necessary interactions related to obtaining the Chinese pucking

machine.  Bell Dep. at 52-54.[5]

### III. DISCUSSION

**A.    Summary Judgment Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for

summary judgment, the Court views the evidence in the light most favorable to the nonmoving

party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not

"rest on mere allegations or denials, but must demonstrate on the record the existence of specific

facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957

(8th Cir. 1995).

**B.    Joint Venture**

Under Minnesota law, a joint venture exists "where two or more persons combine their

money, property, time, or skill in a particular business enterprise and agree to share jointly, or in

proportion to their respective contributions, in the resulting profits and usually in the losses."

Rehnberg v. Minn. Homes, Inc., 52 N.W.2d 454, 456-57 (Minn. 1952).  "Although, in a strict

---

[5] SOS/TWA have produced a MetalBrik Equipment LLC Business Plan, dated April 2004, that discusses the "MetalBrik-SOS Partnership."  Defs.' Ex. 25 at 8-9.  At his deposition, Duncan testified that the plan was "an internal MetalBrik business plan" created by MetalBrik and he "[didn't] believe it was sent to SOS Metals."  Duncan Dep. at 75, 113-15.

sense, not a copartnership, a joint venture generally is governed by rules and principles applicable to partnership relationships." <u>Austin P. Keller Constr. Co. v. Commercial Union Ins. Co.</u>, 379 N.W.2d 533, 535 (Minn. 1986). "The effect of a joint venture is to make individual defendants jointly liable due to their mutual undertaking." <u>Hansen Int'l Sales Corp. v. KT's Kitchens, Inc.</u>, No. C5-96-2017, 1997 WL 147440, at *1 (Minn. Ct. App. May 28, 1997) (citing <u>Walton v. Fujita Tourist Enters. Co.</u>, 380 N.W.2d 198, 202 (Minn. Ct. App. 1986)).

To establish a joint venture, four elements must be satisfied: "(1) contribution by all parties, (2) joint proprietorship and control, (3) sharing of profits but not necessarily of losses, and (4) a contract." <u>Rosenberg v. Heritage Renovations, LLC</u>, 685 N.W.2d 320, 332 (Minn. 2004). The party claiming the existence of a joint venture has the burden of proof. <u>Beehner v. Cragun Corp.</u>, 636 N.W.2d 821, 832 (Minn. Ct. App. 2001). "The existence of a joint venture is ordinarily an issue of fact. But where no competent evidence will support a finding of joint venture, the district court may decide the issue as a matter of law." <u>Duxbury v. Spex Feeds, Inc.</u>, 681 N.W.2d 380, 389-90 (Minn. Ct. App. 2004) (internal citation omitted). Plaintiff argues that SOS/TWA are liable based on a theory of joint venture for various violations of the law pled in its complaint.

### 1.     Contribution

The element of contribution requires that parties "combine their money, property, time, or skill in some common undertaking, but the contribution of each need not be equal or of the same nature." <u>Rehnberg</u>, 52 N.W.2d at 457. Plaintiff argues that all parties to the joint venture made contributions to further the joint venture: Duncan/MetalBrik supplied the machinery, equipment, and employees, and SOS/TWA supplied the operating capital. Plaintiff further

alleges that all parties contributed to sales presentations and made clear that Duncan/MetalBrik would contribute the manufacture of a Puckmaster machine while SOS/TWA would contribute financing to purchase the machine and a scrap metal agreement.  SOS/TWA argue that the contribution element is not satisfied because their time spent participating in sales calls was for the purpose of obtaining scrap metal contracts, under the belief that Duncan was an authorized representative of Puckmaster, and not for "the purpose of diverting business from plaintiff, trading on the Puckmaster trademark, and selling and manufacturing Puckmaster machines in competition with plaintiff."  Defs.' Mem. [Docket No. 177] at 21-22.  SOS/TWA also argue that the money provided to Duncan was for the purchase of the Chinese pucking machine, but even if it was a loan, it does not qualify as a contribution to a joint venture.

Plaintiff has supplied sufficient evidence to support the element of contribution.  Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has established that both SOS and Duncan/MetalBrik contributed time and skill to the alleged joint venture by participating in sales presentations to potential customers.  Together, they attempted to find customers to purchase Puckmaster machines from Duncan/MetalBrik, financed by SOS, in exchange for a long-term scrap agreement between SOS and the customer.  The evidence on contribution of money is less compelling—whether SOS's initial $50,000 advance to Duncan was an investment in MetalBrik or a first payment for the Chinese pucking machine is a fact dispute, and whether a loan, or money from a buyer to a seller, is a "contribution" is a legal issue.  See Meyers v. Postal Fin. Co., 287 N.W.2d 614, 618 (Minn. 1979) ("[Defendant] contributed money only in the sense that every buyer contributes money to a seller.  This is not sufficient to satisfy the contribution requirement."); Treichel v. Adams, 158 N.W.2d 263, 266 (Minn. 1968) (holding that "a creditor,

whose only interest in a business venture is in receiving back his debt, is not engaged in a joint adventure with a debtor . . . .").  While Plaintiff's evidence of contribution is not overwhelming, viewed in the requisite light most favorable to Plaintiff, it is sufficient at the summary judgment stage to establish support for the element of contribution.

### 2.     Control

The element of control requires that there "be a proprietary interest and right of mutual control over the subject matter of the property."  Rehnberg, 52 N.W.2d at 457.  Plaintiff argues that while Defendants each controlled one aspect of the joint venture, together they provided a complete package to the customer, and sales proposals were made mutually.  SOS/TWA argue that the element of control is not established because SOS had no control whatsoever over any aspect of Duncan/MetalBrik's business.  SOS/TWA rely on two cases to support their argument, Beehner v. Cragun Corporation, 636 N.W.2d 821 (Minn. Ct. App. 2001) and Powell v. Trans Global Tours, Inc., 594 N.W.2d 252 (Minn. Ct. App. 1999).

In Beehner, Beehner, a guest at Cragun's resort, bought a ticket at Cragun's for a guided horseback ride organized and conducted by Outback, charged the ticket to her Cragun's bill, and received transportation from the resort to Outback for the ride.  636 N.W.2d at 825.  During the ride, Beehner was thrown from her horse and sustained permanent injuries to her foot and leg. Id. at 826.  In her lawsuit, Beehner alleged that Cragun and Outback were engaged in a joint venture, and therefore Cragun was liable for Outback's negligence.  Id. at 832.  The court found no joint venture, stating "[t]here is no evidence in the record that Cragun had any control or direction over the horses, the trails, the guides, or any other aspect of Outback's business."  Id.

In Powell, the Powells sought to establish a joint venture between Trans Global Tours

18

and Hotel La Ceiba on the basis that Trans Global, a tour operator, listed the hotel in its brochure, made reservations at the hotel for tour participants, and staffed a desk at the hotel.  594 N.W.2d at 256.  The court found no joint venture, stating "none of these facts indicates that the hotel had any control or direction of the means respondent used to arrange tours or that respondent had any control or direction of the means the hotel used to accommodate guests . . . ." Id. at 256.  But see Walton v. Fujita Tourist Enters. Co., 380 N.W.2d 198, 202 (Minn. Ct. App. 1986) (holding that delegating control and dividing responsibilities does not negate the existence of a joint venture).

In this case, the evidence proffered is that SOS and Duncan/MetalBrik traveled together, attended sales calls together, and mutually proposed an idea to customers in which SOS would finance the purchase of a pucking machine from Duncan/MetalBrik, and in exchange, SOS and the customer would establish a long-term scrap agreement.  However, these facts fail to establish a genuine issue of material fact with respect to the right of mutual control.  Plaintiff has supplied no evidence that SOS exercised control over Duncan/MetalBrik's manufacture and sale of pucking machines, or that Duncan/MetalBrik exercised control over SOS's scrap processing business or the way in which SOS entered into scrap agreements with customers.  While SOS and Duncan/MetalBrik may have jointly contacted customers and agreed to a pitch to customers which was mutually beneficial, there is no evidence they had control over one another's separate businesses.  In this case, like in Beehner and Powell, no joint venture exists where two separate companies work together to provide a service and increase their own business, yet are otherwise separate businesses with no real control over the way in which each provides its service to the customer.

Because a finding of joint venture requires that all four necessary elements are satisfied, and because Plaintiff has failed to provide sufficient evidence to support or create a genuine issue of material fact with respect to the element of control, no joint venture existed. However, for the sake of completeness and because they were briefed by the parties, the Court addresses the remaining two joint venture elements.

### 3.   Profit Sharing

The element of profit sharing requires that there "be an express or implied agreement for the sharing of profits (aside from profits received in payment of wages as an employee) but not necessarily of the losses." Rehnberg, 52 N.W.2d at 457. Plaintiff argues that profit sharing is established by documents including the proposals for SOS to buy or invest in the MCT companies or MetalBrik, and the written sales proposals given to customers. SOS/TWA argue that the documents relied on by Plaintiff evidence revenue sharing and not profit sharing, but regardless, making proposals to prospective customers that might help boost both company's own profits is not profit sharing. SOS/TWA argue that here, SOS would profit from a scrap agreement with the customer and Duncan/MetalBrik would profit from the sale of a pucking machine, but their profitability is independently achieved.

SOS/TWA cite case law establishing that no profit sharing exists if a joint venturer is being paid as an employee, Rehnberg, 52 N.W.2d at 457; or if the amount the joint venturer receives is fixed, Duxbury, 681 N.W.2d at 390; or if the money received is merely the re-payment of a debt, Treichel, 158 N.W.2d at 266; or if the money received is a fixed commission or referral fee, Catalano v. N.W.A. Inc., No. PI 98-7768, 1998 WL 777023, at *6 (D. Minn. Sept. 15, 1998). However, none of these scenarios is presented by the fact pattern in the instant case.

Nonetheless, here, the plan is Duncan/MetalBrik retain the profit from the sales of the pucking machines, and SOS retains the profits from the scrap metal agreements. This agreement, by its very nature, is not a profit sharing agreement, but rather a plan as to how SOS and Duncan/MetalBrik will split revenue.  As SOS/TWA argue, the profitability of the separate businesses is not tied to one another, and there is no evidence that this revenue sharing agreement would result in profits for either business.  Plaintiff has not provided evidence to support the element of profit sharing.

      **4.**      **Contract**

The contract element requires that there "be a contract, whether express or implied, showing that a joint adventure was in fact entered into."  Rehnberg, 52 N.W.2d at 457.  Plaintiff argues that the numerous sales proposals made to potential customers demonstrate that an implied contract existed for SOS and Duncan/MetalBrik to work together so that Duncan/MetalBrik could earn profits from the sale of Puckmaster machines and SOS/TWA could profit from long-term scrap metal agreements.  SOS/TWA argue that the sales proposals do not create an implied contract because SOS/TWA had no part in creating the sales proposals, and the sales proposals show an intent for SOS and MetalBrik to enjoy profits in their respective businesses, not an intent to perform as co-owners of a single business for profit.  SOS/TWA also argue that Duncan's investment proposals to SOS do not create express or implied contracts because they were never accepted by SOS.

Viewing the evidence in the light most favorable to Plaintiff, Plaintiff has supplied minimal but sufficient evidence to create a genuine issue of material fact on whether there was an implied contract of joint venture.  Although SOS/TWA aver that they had no role in creating

the sales proposals Duncan presented to prospective customers, they were aware of the written proposals, and attended the sales presentations to the customers.  The proposal to GE discusses "the SOS Metals Option: A Team Approach Designed to Revolutionize GE's Scrap Process," and describes the relationship between MetalBrik and SOS as a "team" and a "working partnership."  Johnson Aff. Ex. L at SOS00097-99.  The proposal given to BP Castrol was entitled "Proposed Partnership for Metal Scrap Processing, Handling and Servicing of Industrial Accounts in Europe.  A new venture between Castrol, MetalBrik, Puckmaster, SOS," and stated its purpose to be: "To form a strategic partnership between Castrol Industrial Europe, SOS Metals, Inc. and MetalBrik/Puckmaster USA for the purpose of securing industrial accounts for swarf and scrap metal processing and handling in Europe."  Johnson Aff. Ex. O.  There is also evidence that Duncan/MetalBrik and SOS attended several sales calls together to market the concept of Duncan/MetalBrik selling pucking machines and SOS earning new scrap metal agreements.  Plaintiff's evidence is sufficient, at least at this stage of the proceedings, to create a genuine issue of material fact with respect to whether an implied contract for a joint venture existed.

### 5.    Joint Venture Conclusion

Although Plaintiff has minimally sufficient evidence to establish the elements of contribution and implied contract, Plaintiff has failed to provide sufficient evidence to create a genuine issue of material fact with respect to the elements of control and profit sharing.  Because Plaintiff has not established the existence of a joint venture, summary judgment is granted for SOS/TWA on Plaintiff's joint venture claim.

22

C.      **Lanham Act**

Plaintiff's direct Lanham Act claim against SOS/TWA is limited specifically to the

Turbocam sale, where Defendants allegedly falsely represented to Doyle that they were

authorized to sell Puckmaster equipment and to trade on the Puckmaster name.  Plaintiff argues

that Turbocam was deceived, and MCT lost a sale because of it.  SOS/TWA respond that while

SOS visited Turbocam on one occasion and offered to buy a Puckmaster machine from Duncan

to be placed at Turbocam in exchange for a long-term scrap agreement between SOS and

Turbocam, SOS believed Duncan was authorized to manufacture and sell Puckmaster machines.

Furthermore, the SOS proposal was not accepted, and SOS had no part in Duncan's sale of a

Puckmaster machine to Turbocam.

The Lanham Act states in relevant part:

> Any person who, on or in connection with any goods or services . . . uses in commerce
> any word, term, name, symbol, or device, or any combination thereof, or any false
> designation of origin, false or misleading description of fact, or false or misleading
> representation of fact, which—(A) is likely to cause confusion, or to cause mistake, or to
> deceive as to the affiliation, connection, or association of such person with another
> person, or as to the origin, sponsorship, or approval of his or her goods, services, or
> commercial activities by another person . . . shall be liable in a civil action by any person
> who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A).  Plaintiff has presented evidence that Duncan falsely represented to

Doyle of Turbocam that he was authorized to manufacture and sell Puckmaster machines.

However, Plaintiff has presented no evidence that SOS made representations to Doyle that it was

authorized to manufacture or sell Puckmaster machines.  In fact, at his deposition, Doyle

testified that he understood Ballow to be affiliated with SOS and not Puckmaster or MetalBrik.

Doyle Dep. I at 105.  Furthermore, SOS has presented evidence that it did not know that

Duncan/MetalBrik was not authorized to sell Puckmaster machines until January 2004 when it

learned about the state court litigation.  No evidence has been proffered that at the time of the July 2003 sales call at Turbocam, anyone at SOS was aware of Duncan's dubious status with Puckmaster.  Finally, Turbocam ultimately purchased a Puckmaster machine from Duncan on its own, and entered into a scrap agreement with MetalBrik, not SOS.  Doyle Dep. I at 68, 108-09; Doyle Dep. II (Defs.' Ex. 18) at 26-29.  Plaintiff has failed to create a genuine issue of fact with respect to its direct Lanham Act claim against SOS/TWA, and as a result, summary judgment on Plaintiff's direct Lanham Act claim against SOS/TWA is granted.

**D.     Aiding and Abetting**

Plaintiff also makes claims that SOS aided and abetted Duncan/MetalBrik's Lanham Act violations, breach of fiduciary duty to MCT, conversion of MCT's assets, and tortious interference with MCT's employment and prospective customer contracts.  To establish its claim that SOS aided and abetted the tortious conduct of Duncan/MetalBrik, Plaintiff must show that (1) Duncan/MetalBrik committed a tort that caused an injury to Plaintiff, (2) SOS knew that Duncan/MetalBrik's conduct constituted a breach of duty, and (3) SOS substantially assisted or encouraged Duncan/MetalBrik in the achievement of the breach.  Witzman v. Lehrman, Lehrman & Flom, 601 N.W.2d 179, 187 (Minn. 1999); see also In re TMJ Prods. Liab. Litig., 113 F.3d 1484, 1495 (8th Cir. 1997).  The second and third elements are evaluated in tandem—"the stronger the evidence of [SOS's] general awareness of the alleged tortious activity, the less evidence of [SOS's] substantial assistance is required," and vice versa.  In re TMJ, 113 F.3d at 1495.  Several factors are considered in evaluating substantial assistance, including the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other, his state of mind, and the

24

duration of the assistance provided.  Id.

Plaintiff has supplied evidence that Duncan, while still an officer and owner of MCT, created MetalBrik, attempted to sell Puckmaster machines on behalf of MetalBrik, took MCT's assets, and hired MCT's employees for his own company.  For purposes of satisfying the first element of the aiding and abetting test, Plaintiff's allegations and facts supporting them are sufficient to establish that Duncan/MetalBrik committed tortious conduct.  As an initial matter, SOS/TWA assert that Plaintiff's aiding and abetting claim must fail, at least with respect to conversion, tortious interference with contracts, and tortious interference with prospective contracts, because Plaintiff does not have a legal interest in the assets in question.

MCT companies assigned  "all intellectual property, trademarks and patents, as well as all claims for enforcement of their trademarks or patents, including infringment and dilution claims under the federal Lanham Act" to Puckmaster, Inc., but sold their assets, including equipment, furniture, fixtures, inventory, supplies, goodwill, and customer lists, and assigned all claims, causes of action, and lawsuits, to Blaine Manufacturing, Inc.  Defs.' Ex. 4; Johnson Aff. Ex. E.  James Cooper, CEO, CFO, and President of Puckmaster, Inc., as well as secretary of Blaine Manufacturing, Inc., testified that Blaine and Puckmaster, Inc. are separate companies, and that no closing has yet occurred on Blaine's asset purchase from MCT.  Cooper Dep. at 53, 74.  Evidence of record shows that either Blaine or MCT owns the assets in question, not Puckmaster, Inc.

Plaintiff has submitted an after-the-fact affidavit from Cooper, asserting that Blaine ratifies the actions of Puckmaster, Inc. in this case and "agrees to be bound in all regards by any final order or judgment to the extent that it affects Puckmaster, Inc., in the same manner that

25

Puckmaster, Inc. would be so bound."  Cooper Aff. ¶¶ 3-4.  Cooper submits his affidavit

pursuant to Rule 17(a) of the Federal Rules of Civil Procedure, which states in relevant part:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the
> real party in interest until a reasonable time has been allowed after objection for
> ratification of commencement of the action by . . . the real party in interest; and such
> ratification . . . shall have the same effect as if the action had been commenced in the
> name of the real party in interest.

Although Puckmaster, Inc. is a separate company from Blaine Manufacturing, Inc., and

would otherwise have no legal interest in the assets in question, Cooper's ratification changes

Puckmaster, Inc.'s ability to raise these claims.  Blaine and Puckmaster, Inc. appear to be closely

related companies, and Cooper plays a prominent role in both.  Because Blaine ratifies

Puckmaster Inc.'s actions and agrees to be bound by any order or judgment with respect to the

claims in this case, the analysis of Plaintiff's aiding and abetting claims can proceed.  See Sun

Refining & Marketing Co. v. Goldstein Oil Co., 801 F.2d 343, 345 (8th Cir. 1986).

The second and third aiding and abetting elements require that SOS had knowledge that

Duncan/MetalBrik's conduct constituted a breach of duty and that SOS substantially assisted or

encouraged Duncan/MetalBrik in breaching a duty.  SOS avers that it did not learn until mid-

January 2004 that "there may be some questions as to Mr. Duncan's ability to sell Puckmaster

equipment or use the Puckmaster name in connection with his business," and that "SOS Metals

did not participate in any sales calls with Mr. Duncan after finding out about the state court

litigation."  Bell Aff. ¶ 3.  Bell further avers that SOS severed its relationship with Duncan after

receiving copies of the state court pleadings, except for necessary interactions related to

obtaining the Chinese pucking machine.  Bell Dep. at 52-54.  However, emails from September

2003 raise a genuine issue of material fact as to whether SOS/TWA may have known earlier and

known more about Duncan/MetalBrik's plans to convert the assets of MCT, hire MCT employees, and sell Puckmaster machines in the name of MetalBrik. The record evidence suggests that in the beginning, SOS/TWA were under the impression that Duncan was authorized to sell Puckmaster machinery. However, that understanding changed at some point, and the question remains, when did that understanding change?

SOS avers that it viewed Duncan's proposals as "fantasyland," and "something that we wouldn't have been interested in." Bell Dep. at 95; D. Shadrow Dep. at 86. Nonetheless, viewed in the light most favorable to Plaintiff, the emails create a triable issue of fact as to whether SOS/TWA aided and abetted Duncan/MetalBrik's violation of the Lanham Act, breach of fiduciary duty, conversion, tortious interference with contracts, and tortious interference with prospective contracts. Furthermore, there is an issue of fact with respect to whether the $50,000 advanced to Duncan was a down payment for the Chinese pucking machine or an advance to support Duncan's operations. If the money is construed as an advance, it may satisfy "substantial assistance" in support of Duncan/MetalBrik's actions against MCT. Plaintiff has presented a genuine issue of material fact, and summary judgment with respect to Plaintiff's aiding and abetting claims is denied.

**E.      Civil Conspiracy**

In its Amended Complaint, Plaintiff alleges that "Defendants individually, and collectively, have conspired and acted in concert to deceive an[d] mislead the consuming public, including valuable customers and potential customers of plaintiff, concerning their affiliation with Puckmaster and their ability to provide Puckmaster equipment to customers." Am. Compl. ¶ 36. SOS/TWA argue that because a civil conspiracy claim must be based on the commission

of an underlying tort, and because it is duplicative of Plaintiff's other claims, it must be

dismissed.  See Gaming Corp. of Am. v. Dorsey & Whitney, 88 F.3d 536, 551 (8th Cir. 1996).

While Plaintiff's civil conspiracy claim is duplicative of its aiding and abetting claim, there

currently is a factual and legal basis for it, and so it will remain at this juncture.

**F.      Damages**

SOS/TWA filed a separate Motion for Summary Judgment on Plaintiff's Claims for

Damages, and assert various arguments in support of their contention that Plaintiff is not entitled

to damages or injunctive relief for any of its claims against SOS/TWA.

**1.      Turbocam Sale**

Plaintiff contends that SOS/TWA are indirectly liable for damages caused by

Duncan/MetalBrik.  Plaintiff has limited its Lanham Act claim to its lost sale of a Puckmaster

machine to Turbocam as a result of Duncan/MetalBrik's actions.  SOS/TWA argue that Plaintiff

can not recover actual damages from them because (1) it can not show confusion by Turbocam

as to any of SOS/TWA's actions or representations, (2) it can not show sufficient bad intent, (3)

it inexcusably delayed in asserting its rights and thereby prejudiced SOS/TWA, and (4) it

produced no evidentiary support for Plaintiff's damage calculations for the alleged lost sale.

To recover damages under the Lanham Act, "Plaintiff must prove both actual damages

and a causal link between [D]efendant[s'] violation and those damages."  Rhone-Poulenc Rorer

Pharms., Inc. v. Marion Merrell Dow, Inc., 93 F.3d 511, 515 (8th Cir. 1996).  "Proof of actual

confusion is necessary for an award of damages."  Woodsmith Publ'g Co. v. Meredith Corp.,

904 F.2d 1244, 1247 n.5 (8th Cir. 1990).

SOS/TWA are correct in contending that Plaintiff can not recover damages from

SOS/TWA for the lost sale to Turbocam.  Plaintiff has presented evidence that

Duncan/MetalBrik represented to Turbocam that they were able and did sell a Puckmaster

machine to Turbocam.  Although SOS offered to buy a Puckmaster machine from Duncan to be

placed at Turbocam in exchange for a long-term scrap metal agreement between SOS and

Turbocam, Turbocam ultimately purchased a Puckmaster directly from Duncan, and never

entered into a long-term scrap agreement with SOS.  At his deposition, Doyle testified that he

understood Ballow to be affiliated with SOS and not Puckmaster or MetalBrik.  There is also no

evidence in the record that in July 2003, SOS knew that Duncan/MetalBrik were not authorized

to sell Puckmaster machines.  The record only establishes that SOS learned of

Duncan/MetalBrik's inability to sell Puckmaster machines in January 2004, or possibly around

September 2003.  Although Plaintiff may be able to establish that Duncan/MetalBrik violated the

Lanham Act with respect to the Turbocam sale, it has not presented any evidence that SOS/TWA

violated the Lanham Act with respect to the Turbocam sale, either directly or indirectly.  Instead,

the evidence in the record, even viewed in the light most favorable to Plaintiff, supports the

conclusion that SOS/TWA did not represent that they were able to make or sell Puckmaster

machines, and did not know that Duncan/MetalBrik were not authorized to represent

Puckmaster.  Accordingly, Plaintiff is not entitled to damages from SOS/TWA for the loss of the

Turbocam sale.

### 2.    Injunction

In its Amended Complaint, Plaintiff asks "[f]or a temporary and permanent injunction,

prohibiting defendants from continuing to trade on the registered names 'Puckmaster' and

'Shredmaster' and prohibiting them further from deceiving the public or referencing those names

in any commercial venture." Am. Comp. at 10.  SOS/TWA argue that Plaintiff is not entitled to

injunctive relief.  SOS/TWA further argue that it is unclear what injunctive relief Plaintiff might

be seeking against them, as there is no evidence that SOS/TWA traded on the Puckmaster name.

The Court agrees that there does not appear to be any basis for an injunction against SOS/TWA.

Therefore, Plaintiff's request for an injunction against SOS/TWA is denied.

### 3.     Other Damages

Next, SOS/TWA argue that Plaintiff's claims for damages for conversion of assets fail

for lack of evidentiary support for Plaintiff's calculations.  "The measure of damages in

conversion cases is generally the value of the property at the time of the conversion plus

interest." Molenaar v. United Cattle Co., 553 N.W.2d 424, 431 (Minn. Ct. App. 1996).

SOS/TWA argue that Plaintiff's damage calculations are speculative, and that Plaintiff's "soft

estimates" are not sufficient to determine the proper measure of damages.  Plaintiff has

submitted trial testimony and exhibits from the state court litigation to establish the hard and soft

assets converted by Duncan/MetalBrik.  Johnson Aff. Exs. P-S, LL, MM, RR.  Plaintiff also

relies on the trial testimony and exhibits to establish the value of the converted hard and soft

assets.  Id.  For example, Mark Wildes testified that he tried to determine the value of the

converted hard assets by looking for comparable items in catalogs and relying on the prices

listed, or estimating the value based on his own knowledge and background.  Wildes Trial Test.

at 121-28.  Although Plaintiff has supplied what appears to be a fairly comprehensive list of the

hard assets, soft assets, and monies converted, it is unclear from the testimony and exhibits

provided whether Plaintiff's value estimates reflect the correct measure of damages in

conversion cases.

Further, SOS/TWA aver that Plaintiff did not respond to SOS/TWA's second set of interrogatories, which included damage calculations, until two months after the discovery period closed. SOS/TWA aver that due to Plaintiff's late response, they were unable to depose Plaintiff to explore the bases for its damage calculations. As a result, SOS/TWA request an opportunity to depose Plaintiff before trial as to the categories and calculation of damages in the documents and written discovery produced after the discovery deadline.

It is apparent from these arguments that further discovery related to damage calculations is necessary before trial. The parties are directed to have a scheduling conference before Magistrate Judge Janie S. Mayeron to determine a timetable for and the scope of discovery on the limited issue of damages for conversion. Specifically, Plaintiff must provide a comprehensive list of the hard assets, soft assets, and monies converted, and value estimates that reflect the correct measure of damages in conversion cases. Also, SOS/TWA must be provided an opportunity to depose Plaintiff to explore the bases for its damage calculations.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants SOS Metals, Inc. and Transworld Alloys, Inc.'s Motion for Summary Judgment [Docket No. 160] is **GRANTED IN PART AND DENIED IN PART**. Specifically, summary judgment is granted on Plaintiff's joint venture claim and direct Lanham Act claim. Summary judgment is denied on Plaintiff's aiding and abetting claim, and civil conspiracy claim.

2. Defendants SOS Metals, Inc. and Transworld Alloys, Inc.'s Motion for Summary Judgment on Plaintiff's Claims for Damages [Docket No. 180] is **GRANTED IN PART AND**

**DENIED IN PART**.  Specifically, summary judgment is granted on Plaintiff's request for

damages from SOS/TWA under indirect theories of liability under the Lanham Act, and

Plaintiff's request for an injunction.  Summary judgment is denied with respect to Plaintiff's

remaining claims for damages, and limited additional discovery regarding damages will be

permitted.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  December 7, 2006.